1

2

3

4

5

6

7                          HEARING

8

         OFFICE OF REVIEW AND APPEALS

9

10

11              DEPARTMENT OF EDUCATION

12           65 COURT STREET, ROOM 717

13              BROOKLYN, NEW YORK

14

15

                     MAY 23, 2006

16

17

18

19

20

21

22

23

                      **Angie DePompo**
24            **Court Reporting Service**
                   686 Kensico Street
25           Staten Island, New York 10306
                    (718) 667-9484

2

1
2          MR. GOLDBERG:    Today is Tuesday,
3    May 23rd, 2006.
4          Good afternoon.  I am Ira Goldberg,
5    assigned chairperson of this Chancellor's
6    Committee.
7          An attendance sheet has been
8    circulated at 65 Court Street.  The people
9    present today have signed their name.
10          Speaking to us from their school is
11   Josephine Marcella (phonetic), principal
12   of PS212, and Carl Santamaria, principal
13   of PS153.
14          It is now approximately 1:25 p.m. on
15   Tuesday, May 23rd, 2006.  We are meeting
16   pursuant to Article 4, Section 4.3.3,
17   formerly 5.3.4, to review the appeal from
18   a rating of unsatisfactory given by
19   Principal Carl Santamaria to Mr. Glenn
20   Storman, the appellant, who is a guidance
21   counselor at PS153 and PS212, for the
22   period ending June, 2005.  The appellant
23   is presently employed as a guidance
24   counselor.
25          I will now ask each of you to

3

1

2    identify yourselves for the record, and

3    state the capacity in which you are here

4    today.

5        MR. BOYLES:    Dennis Boyles,

6    confidential investigator, Chancellor's

7    Office for Special Investigations.

8        MR. GOLDBERG:    Would you speak up,

9    please.

10        MR. STORMAN:    Glenn Storman and

11    counselor.

12        MR. GROSSMAN:    Michael Grossman, the

13    appellant's advisor.

14        MR. GOLDBERG:    Ira Goldberg,

15    Chancellor's assigned chairperson for this

16    review.

17        The principals, please.

18        MR. SANTAMARIA:    Carl Santamaria,

19    PS153.

20        MS. MARCELLA:    Josephine Marcella,

21    PS212.

22        MR. GOLDBERG:    Okay.  We will now go

23    off the record to review the documents.

24        (Whereupon, a break was taken.)

25        MR. GOLDBERG:    We are now back on

4

the record.

I will briefly outline the procedures
we will follow this afternoon.

The entire session is recorded.
Proper protocol is to be adhered to at all
times to facilitate this process. You are
asked to be an active listener. Kindly
use appropriate voice tone and level. You
may request to go off the record at any
point.

The UFT advisor will be asked to
present any procedural objections. I will
respond to each objection by denying or
sustaining the objections.

The reigning officer will be asked to
make a statement or stand on the record.
Each member of the administration may make
a statement as well.

The UFT advisor may cross-examine the
rating officer and any member of the
administration who makes a statement.

The appellant or his advisor will be
asked to make a statement. The reigning
officer may question the appellant, but

5

only through the chair.  The reigning
officer may make a final statement or
stand on the record.

The UFT advisor will make the final
statement.

Please be advised that a copy of this
proceeding can be obtained at a nominal
cost.

We will now -- does everyone have the
documents?

MS. MARCELLA:   I don't have mine.

MR. GROSSMAN:   Still waiting for
mine.

MR. GOLDBERG:   Okay.  We will go off
the record for a minute.

(Whereupon, a break was taken.)

MR. GOLDBERG:   We are back on the
record now.  I would like to ask the UFT
advisor if there are any procedural
objections.

MR. GROSSMAN:   Yes, I have.  I have
a procedural objection to the rate sheet.
You'll note that the -- while the
principal may have signed off on this June

1                                                              6

2          30th, this was not given to Mr. Storman

3          until September 7th of 2005, which is well

4          after the rating period and also in

5          violation of Section 89 of the

6          Chancellor's Regulation, which I'll read

7          it for the record.  It says as follows,

8          the mandate for the evaluation of

9          employees and the timing thereof is

10         contingent to Section 89.

11              Subdivision 7 is what counts for Mr.

12         Storman.  It says in Subdivision 7, within

13         the last ten school days of each school

14         year, but not fewer than four school days

15         prior to the close thereof, the principal

16         of each school shall give to each member

17         of his or her staff a signed statement

18         characterizing his or her work as

19         satisfactory or unsatisfactory.  This was

20         not done during the last ten school days,

21         not even the last four days, which would

22         be a technicality, but this is beyond

23         technicality because this was given to him

24         the next term or the next school year,

25         which was September 7th of 2005.

Angie DeBonne, Court Reporting Service
(718) 667-9484

7

1

2          MR. GOLDBERG:  Was there any reason

3     why there was a delay in giving the rating

4     sheet?

5          MR. SANTAMARIA:  There was a

6     clerical error in the distributing of the

7     rating sheets.

8          Mr. Storman was told about the rating

9     on June 29th, and he did receive certified

10    mail, return receipt requested, on the 2nd

11    day of summer school, the actual rating,

12    on July 6th.

13         MR. GOLDBERG:  July what?

14         MR. SANTAMARIA:  6th.

15         MR. GOLDBERG:  Okay.

16         MR. GROSSMAN:  There is no proof of

17    this.

18         MR. GOLDBERG:  Do you have a copy of

19    that?

20         MR. SANTAMARIA:  I have the return

21    receipt request little receipt.  Fax that?

22         MR. GOLDBERG:  You'll fax that to

23    935-2073.

24         MR. SANTAMARIA:  935-2073.

25         MR. GROSSMAN:  (Inaudible) that is

8

1

2    late, in terms of July, but whether it's

3    July or September, it doesn't make a

4    difference.

5        MR. GOLDBERG:    The rating sheet is a

6    legal document.  According to the rating

7    officer, the principal, there was a delay,

8    and it did go out at the beginning of

9    July, and there's postal return receipt

10   proof that it was mailed.  It was signed

11   off by Mr. Storman on September 7th.

12       Your objection is noted for the

13   record, but it is denied.

14       MR. GROSSMAN:    Okay.  I have an

15   objection to document number 2.  This is

16   from Thomas Hylan (phonetic) to Josephine

17   Marcella.  It is a third-party letter, and

18   also, it is undated.

19       MR. GOLDBERG:    If you look on page

20   2.1, the memo is dated February 9th, 2005.

21       MR. GROSSMAN:    It's not really the

22   same -- it's not really the same document.

23   In other words, technically speaking, this

24   should be treated as a separate document

25   because one, there's two Thomas Hylan, and

9

the other one is twelve Thomas Hylan.  So,
if we treat this as a separate document,
then I'm objecting to this as a separate
document.  Not to the entirety.

MR. GOLDBERG:    This is a summary
page, saying that the investigation has
been completed, and it's attached to this
document.

MR. GROSSMAN:    All right, but,
however, it is undated, though.  In other
words, this is another memo that was sent.
It is not the same memo.

MR. GOLDBERG:    But it is referring
to the OSI report that is attached.

MR. GROSSMAN:    Yes, but, however, we
should know the date because if it's --
suppose, let's say, this was given after
April, then it would be more than six
months.  The statute of limitations is six
months for anyone from the Chancellor's
Office, in terms of handing out a
document.

MR. GOLDBERG:    The actual report is
dated February 9th, --

1                                                        10

2              MR. GROSSMAN:   Not the actual

3        report.

4              MR. GOLDBERG:   -- which is attached.

5              MR. GROSSMAN:   Okay, but I would

6        like it noted for the record that this

7        memo to Ms. Marcella was not dated.

8              MR. SANTAMARIA:   SOB and OSI is that

9        going to go out either before February 9th

10       or on February 9th with the report.  So,

11       it's a typographical error on my part, but

12       it certainly was done on or before

13       February 9th, 2005.

14             MR. GOLDBERG:   Your objection is

15       noted for the record, Mr. Grossman.

16             MR. GROSSMAN:   I'm curious.  How

17       could that be done before February 9th if

18       the memorandum itself is dated February

19       9th?

20             MR. SANTAMARIA:   Normally, when we

21       substantiate a case, okay, if the teacher

22       is reassigned, there is a period of time

23       to conclude your investigation from the

24       time you actually, you know, finish typing

25       your report, --

Angie DePompo, Court Reporting Service
(718) 667-9484

11

1

2          MR. GROSSMAN:   Okay.

3          MR. SANTAMARIA:   -- and if a teacher

4     is reassigned and the case is not

5     substantiated, we'll send it out to

6     expedite the teacher getting back to the

7     classroom as soon as possible, but if the

8     case is going to be substantiated, we

9     advise him that the case is substantiated

10    and a report is to follow.

11         MR. GROSSMAN:   We'll concede what

12    Mr. (inaudible) this.

13         MR. SANTAMARIA:   Thank you.

14         MR. GOLDBERG:   Any other objections?

15         MR. GROSSMAN:   No.

16         MR. GOLDBERG:   I call on the

17    administration to make a statement or

18    stand on the record, and I will ask --

19    afterwards, I would also ask Mr. Boyles to

20    give a statement regarding the report.

21         I'll call on the principals first, if

22    they would like to make a statement for

23    the record or stand on the record.

24         MR. GROSSMAN:   They don't know who

25    goes first.

1                                                          12

2            MR. GOLDBERG:   Okay, let's define

3       that.

4            MS. MARCELLA:   Can you explain what

5       you're saying, please, --

6            MR. SANTAMARIA:   Yes, what does that

7       mean exactly?

8            MS. MARCELLA:   -- because it's very

9       difficult to understand you.

10           MR. GOLDBERG:   Okay.  Ms. Marcella,

11      I would like you to make a statement for

12      the record regarding why this pedagogue

13      was given an unsatisfactory rating.  Why

14      are we here today?  You know, why did you

15      rate Mr. Storman unsatisfactory in June,

16      2005?

17           MS. MARCELLA:   Okay.  I rated Mr.

18      Storman unsatisfactory because, although I

19      did not conduct the investigation, I did

20      sit in with Mr. Boyles, and the conclusion

21      of his investigation was that it was

22      substantiated for corporal punishment.

23           Then, I met with Mr. Storman, with

24      his union rep, and I wrote him a letter.

25           Do you have the letter that Mr.

Angie DePompo, Court Reporting Service
(718) 667-9484

13

Storman received?  It is dated March 11th, 2005.

MR. GOLDBERG:  No.  No, you never submitted that with the file.

MS. MARCELLA:  I submitted everything, sir.

MR. GOLDBERG:  No, we do not have that letter.

MS. MARCELLA:  Okay.  Do you want me to fax it over to you?

MR. GOLDBERG:  No, not at this time. It's okay.

MS. MARCELLA:  All right.  That was in the package, though, everything I had to submit.

MR. GOLDBERG:  Do you want to refer to why you -- what kind of a letter and what it was?  You can do that in oral testimony.

MS. MARCELLA:  Well, do you want me to read it?

MR. GROSSMAN:  I will object to that.  She can refer to it.

MR. GOLDBERG:  You can refer to it.

1

2      I mean, --

3              MS. MARCELLA:    Okay.

4              MR. GOLDBERG:    -- you know,

5      basically what it was.

6              MS. MARCELLA:    All right.  I --

7      basically, what happened was, when this

8      incident occurred in October, I had asked

9      Mr. Storman at that time if he wanted to

10     fill out a statement form, which is done

11     on a current sheet, and he did, and part

12     of his statement was that, he writes and I

13     quote, I may have touched the child's

14     mouth with the paper and walked away.

15              When I read Mr. Boyles' statement,

16     Mr. Storman -- and I quote from Mr.

17     Boyles' --

18              MR. GOLDBERG:    Report.

19              MS. MARCELLA:    -- from his report,

20     it says, I quote, Mr. Storman further

21     stated that in retrospect he should not

22     have touched student A with the piece of

23     paper.

24              So, in my letter, I wrote -- I spoke

25     to Mr. Storman with his union

15

representative, and he stated that he did
touch the student with the piece of paper,
and this is not acceptable.  There should
not be any contact with the student.  He
could have verbally reprimanded the child.

So, because it was substantiated by
Mr. Boyles, and because of what Mr.
Storman wrote about, may have touched the
child and walked away, and then in
retrospect should have not touched the
child with the paper, he is admitting that
he did touch the child, and there should
not be any physical contact.

So, my reasoning for giving him a "U"
rating is because of substantiated
corporal punishment.

Now, my -- also, I would like on the
record that I did report this to Mr.
Santamaria at the beginning of June.

MR. GOLDBERG:    Thank you.

Mr. Santamaria, any statement for the
record?  Any statement or stand on the
record?

MR. SANTAMARIA:    I guess -- no, not

Angie DeRenzo, Court Reporting Service
(718) 667-9484

16

1

2      really.  I stand on the record.

3          MR. GOLDBERG:  I would like to ask

4      Mr. Boyles, from the Office of Special

5      Investigators, if you would like to make a

6      statement for the record?

7          MR. BOYLES:  Yes.  I interviewed --

8      I responded to the school after being

9      assigned this investigation, and the

10     initial complaint went to the Special

11     Commissioner of Investigations, which

12     referred it to my office for

13     investigation.

14         The original complaint was from the

15     boy's father, who indicated he believed

16     that the physical contact made by Mr.

17     Storman was sexual in nature, that he was

18     having a sexual fantasy when he did this.

19         I spoke to several students at the

20     school, who were all special education

21     students.  It is my experience a lot of

22     times special education students have a

23     hard time remembering incidents of this

24     nature.

25         Student A indicated that Mr. Storman

17

rolled up a piece of paper and touched him

on his face with it, and the student

admitted at the time that he didn't think

it was sexual in nature.

Mr. Storman, based on his written

statement and the conversation I had with

him, where he said he might have touched

the kid when he was motioning for him to

be quiet because he had a piece of paper

in his hand, based on that, I

substantiated for inappropriate touching,

and I forwarded the report to Ms.

Marcella.

MR. GOLDBERG:    Thank you.

MS. MARCELLA:    May I say something

else?

MR. GOLDBERG:    Yes.

MS. MARCELLA:    Okay.

MR. GOLDBERG:    Yes.

MS. MARCELLA:    Oh, I can?

MR. GOLDBERG:    Yes.

MS. MARCELLA:    Oh, okay.    I just

wanted to mention that because I am not

Mr. Storman's payroll school, the

18

1

2    principal of the school, that's why I

3    could not give him his rating sheet.

4        MR. GOLDBERG:   I understand.  We

5    understand that.

6        MS. MARCELLA:   Okay.

7        MR. GOLDBERG:   Okay, thank you.

8        I would like to call on the UFT

9    advisor, Mr. Grossman, to question the

10    administration or --

11        MR. GROSSMAN:   Yes, right.  I'm

12    going to do everybody.

13        MR. GOLDBERG:   Of course.

14        MR. GROSSMAN:   Okay.  Mr.

15    Santamaria, can you hear me okay?

16        MR. SANTAMARIA:   Yes.

17        MR. GROSSMAN:   Okay.  When you rated

18    Mr. Storman unsatisfactory, was that based

19    upon a conclusion on the part of Ms.

20    Marcella that corporal punishment was

21    committed?

22        MR. SANTAMARIA:   Correct, yes.

23        MR. GROSSMAN:   Okay, but, however,

24    did you see any documentation at all from

25    that charge or just based it upon Ms.

19

Marcella's expertise or advice?

MR. SANTAMARIA:    Ms. Marcella is one
of my super -- I'll explain it.  Ms.
Marcella is like a supervising principal
for me, and if she was advised by her
(inaudible)

MR. GROSSMAN:    Okay.  All right, I
just wanted to make sure where it came
from.

MR. SANTAMARIA:    Um-hm.

MR. GROSSMAN:    Okay, I have no
further questions.

Now, Ms. Marcella, --

MS. MARCELLA:    Yes.

MR. GROSSMAN:    -- did you call the
Office of Special Investigations, Special
Commissioner of Investigations, regarding
Mr. Storman, based on an accusation made
by Student A's father?

MS. MARCELLA:    No, I didn't call, I
put it online.

MR. GROSSMAN:    Oh, you put it
online.

MS. MARCELLA:    Yes.

Angie DePompo Court Reporting Service
(718) 667-9484

20

MR. GROSSMAN:    But, however, did you put it online on the basis of an accusation that was made by the father of Student A?

MS. MARCELLA:    Yes, I just reported what was -- the information that was given to me.

MR. GROSSMAN:    Okay.  Now, did Student A's father relate to you that Mr. Storman brushed a rolled up piece of paper against his son's lips, and that Mr. Storman was acting out a sexual fantasy?

MS. MARCELLA:    That's what the father claimed.

MR. GROSSMAN:    Now, if Student A's father omitted his son's theory or his theory about the alleged sexual fantasy, would you still have called the Office of the Special Commissioner?

MS. MARCELLA:    I'm sorry.  Sir, I missed the last few words, I'm sorry.

MR. GROSSMAN:    I'll repeat it.

Suppose -- it is hypothetical, but if Student A's father omitted the part about

21

1

2    his son's theory or the father's theory

3    about the alleged sexual fantasy, would

4    you have still call the Office of the

5    Special Commissioner of Investigations?

6        MS. MARCELLA:    Yes, I would have

7    reported it because --

8        MR. GROSSMAN:    I didn't ask you why.

9    I just asked you if you would or you

10   wouldn't?

11       MS. MARCELLA:    Okay, I would have.

12       MR. GROSSMAN:    All right.  Now, did

13   you call the Office of the Special

14   Commissioner on the same day Student A's

15   father called you?

16       MS. MARCELLA:    I could tell you that

17   in a minute, sir, just hold on.

18       MR. GROSSMAN:    That's all right.

19   I'm going by the report.

20       MS. MARCELLA:    Yes.  The date here

21   is 10/26/04.  The report was made

22   10/26/04.

23       MR. GROSSMAN:    You made the report

24   10/26/04?

25       MS. MARCELLA:    That's what it says.

1                                                          22

2           The control number I have in front of me,

3           it looks like 10/26/04.

4                   MR. GROSSMAN:  Well, according to

5           the origin of the complaint on 2.1, it --

6                   MS. MARCELLA:  One second.

7                   MR. GROSSMAN:  Yes.

8                   MS. MARCELLA:  I'm looking at the

9           papers in front of me because it was in

10          October.  It says that the control number

11          has been generated for this report

12          10/26/04.

13                  MR. GROSSMAN:  Now, --

14                  MS. MARCELLA:  One second -- 11 --

15          I'll tell you in a minute.  I have to

16          refresh my memory.  It was a while ago.

17                  MR. GROSSMAN:  If you look at 2.1,

18          that could refresh your memory.

19                  MR. GOLDBERG:  If you look at the

20          report in the first paragraph.

21                  MS. MARCELLA:  In the report, one

22          second -- 11/16.  Yes, okay.  What

23          happened was, it happened October 26th,

24          and the father called me a few days after

25          that happened.  What happened was, the

23

child was absent from school, and when we
called the house to find out why the child
was absent, the father spoke to me and he
said that he had been trying to get the
school, and he's not sending back the
child because of this teacher being in the
school that did something to his child.

So, I said, well, sir, I have to
speak to your child. Please send your
child back to school, and he said, well, I
don't want my child questioned until I'm
there with him, and the father did not
come until 11/16, whatever that day is,
and that's when I reported it when the
father came up.

MR. GROSSMAN: Okay. So, therefore,
what you're saying is that you reported
this incident, waiting for this child --

MS. MARCELLA: I didn't know what it
was.

MR. GROSSMAN: -- three weeks --

MS. MARCELLA: The father refused to
tell me until he was with --

MR. GROSSMAN: Ma'am, I'm going by

24

the facts.  You waited three weeks after
the alleged incident had occurred to make
a report; is that correct?

MS. MARCELLA:  Sir, I couldn't make
a report if I didn't know what the
incident was.  The man refused to tell me.

MR. GROSSMAN:  I didn't ask you
whether or not -- whether you could or
your couldn't.  I'm just establishing a
fact that you waited three weeks after the
alleged incident before you made a report
because obviously, you could have made a
report, and could not --

MS. MARCELLA:  No, I could not
because if you're familiar with the online
occurrence reports, if you don't put in
certain information, it won't take the
report.

MR. GROSSMAN:  So, if that child
never came back to school at all, then you
would never have -- then you would never
have made a report.

MS. MARCELLA:  No, I wouldn't know
what to put in.  If you go online and try

25

to put in the report, you'll know what I

mean.  I've been doing it for three years.

MR. GROSSMAN:  Okay.  I wanted to

establish that this was done three weeks

later.

MS. MARCELLA:  It was done the

minute I found out about what had

happened.

MR. GROSSMAN:  Uh-huh.

Is it a fact that when you spoke with

Mr. Storman, after the incident, that you

told him you had no intention of making

any such report and you only did it after

the father called you; isn't that correct?

MS. MARCELLA:  Absolutely not.

MR. GROSSMAN:  Okay.

MS. MARCELLA:  I report everything

that comes by me, everything.

MR. GROSSMAN:  But you reported it

three weeks after the incident.

MS. MARCELLA:  I didn't know what

the incident was, sir.

MR. GROSSMAN:  I have no further

questions.

Angie DePeno Court Reporting Service
(718) 667-9484

26

1

2          You didn't know what the incident

3    was?

4          MS. MARCELLA:   No.

5          MR. GROSSMAN:   Okay.

6          MS. MARCELLA:   I could not report

7    something on a teacher if I don't know

8    what it is.

9          MR. GROSSMAN:   Well, the father had

10   already called you, so you had some

11   knowledge of the incident.

12         MS. MARCELLA:   But I didn't know

13   what the incident was, sir.

14         MR. GROSSMAN:   Even though the

15   father called you?

16         MR. GOLDBERG:   Mr. Grossman, --

17         MS. MARCELLA:   He said to me, you

18   cannot speak to my son.

19         MR. GOLDBERG:   -- she answered it.

20   She answered it.

21         MR. GROSSMAN:   Fine.

22         MS. MARCELLA:   I answered it.

23         MR. GOLDBERG:   Okay, Ms. Marcella.

24   Yes.

25         MR. BOYLES:   The online system for

27

1

2    filing complaints, if certain data is not

3    entered, it won't allow you to go to the

4    next -- to continue.

5         MS. MARCELLA:   Thank you.

6         MR. GROSSMAN:   Let me question Mr.

7    Boyles.

8         Mr. Boyles, is it fair to say that

9    your report was written in the third

10   person, that is, it paraphrased the

11   statements made by the people who were

12   interviewed?

13        MR. BOYLES:   That is correct.

14        MR. GROSSMAN:   Now, did you

15   proofread this report before it was sent

16   to Mr. Hylan?

17        MR. BOYLES:   Yes.

18        MR. GROSSMAN:   Okay.  Did Mr.

19   Storman have the same opportunity to

20   proofread your report before it was sent

21   to Mr. Hylan?

22        MR. BOYLES:   No.

23        MR. GROSSMAN:   Were your interviews

24   audio or videotaped?

25        MR. BOYLES:   No.

28

MR. GROSSMAN:   Do you have
transcripts of your interviews, that is
questions made -- questions asked and
answers made?

MR. BOYLES:   No.

MR. GROSSMAN:   In your background
check of Mr. Storman, did you conclude
that there were no previous corporal
punishment accusations made against him?

MR. BOYLES:   I believe he had one
prior case of harassment which was
unsubstantiated.

MR. GROSSMAN:   No, I'm not asking
about harassment --

MR. BOYLES:   No, no prior cases.

MR. GROSSMAN:   -- or anything
unsubstantiated, but there were no priors
--

MR. BOYLES:   No.

MR. GROSSMAN:   -- as far as corporal
punishment.   Okay.

Now, when you interviewed Student A,
did he contradict what he originally
claimed regarding his theory that Mr.

Diamond Court Reporting Services
(718) 667-9484

29

Storman acted out of a sexual fantasy by stating to you that he does not believe that Mr. Storman's action was sexual in nature?

MR. BOYLES:   Yes, but he didn't -- well, the original complaint was his father's words.  I don't know where the father got that from, if the son had told him that, but when I spoke to Student A, he told me that Mr. Storman made physical contact with him with the piece of paper. When I questioned him about it being sexual in nature, he said he didn't believe it was sexual in nature.

MR. GROSSMAN:   But prior to your speaking with Student A, was that accusation regarding a sexual nature made to you?

MR. BOYLES:   It was made to me in the written complaint.

MR. GROSSMAN:   Now, you heard the principal state before that the principal could not send you anything online until she had the conversation with the student'

30

is that correct, you heard that?

MR. BOYLES:    That is correct.

MR. GROSSMAN:    So, therefore, wouldn't it be logical then that the student repeated the same thing that the father said if that was the basis of her sending you something online regarding the accusation?  She wouldn't go by what the father said.  She would only go by what the student said.  So, therefore, if you heard something about a sexual nature, by logic, that came from the student then.

MR. BOYLES:    Standard procedure for reporting cases, anything -- when anything sexual is mentioned, it goes to the Office of Special Commissioner.  When it's inappropriate touching or corporal punishment or verbal abuse, the complaint goes to the Office of Special Investigations.

In this particular case, and I've dealt with Ms. Marcella numerous times in the past and she's very, very cautious, she reported this incident both to the

1                                                                          31

2              Special Commissioner's Office and to my

3              office at the same time.

4                   MR. GROSSMAN:   I understand, but,

5              however, I'm not getting into the

6              protocol.  What I'm trying to ask you is

7              that you said before that this might have

8              been the father's theory and not the son's

9              theory; correct?

10                  MR. BOYLES:   Well, based on the

11             complaint that I got, which was referred

12             from the Office of Special Commissioner,

13             said that the father related these facts.

14                  MR. GROSSMAN:   Right.  He related

15             these facts, but, however, --

16                  MR. BOYLES:   Now, to show me that

17             the father got that information from his

18             son seeing that the father is not in the

19             class.

20                  MR. GROSSMAN:   Okay, fair enough.

21             So, he got this information from his son?

22                  MR. BOYLES:   That's correct.

23                  MR. GROSSMAN:   So, therefore, his

24             son did contradict himself when now he's

25             saying that he doesn't believe there was

**EXHIBIT E: TRANSCRIPT OF HEARING**                        **Page 31**

32

anything sexual in terms of what Mr.
Storman had done?

MR. BOYLES:  Right, and my
conclusion indicated that we didn't
believe it was sexual in nature.  I had
substantiated that part of it.

MR. GROSSMAN:  Yes, I know that, but
I just wanted to make sure in terms of the
student's state of mind, in terms of
before and after.

Now, was Student A, to your
knowledge, a special education student?

MR. BOYLES:  Yes.

MR. GROSSMAN:  Did you conduct a
psychological background check on Student
A?

MR. GOLDBERG:  Could you repeat that
again.

MR. GROSSMAN:  Okay.  Did you
conduct a psychological background check
on Student A?

MR. BOYLES:  No, sir.

MR. GROSSMAN:  So, there was no way
for you to know whether or not Student A

Angie DePompo Court Reporting Service
(718) 667-9484

33

may have been emotionally disturbed?

MR. BOYLES:    I believe Ms. Marcella

informed me that the students in the class

of special education, they are learning

disabled.

MR. GROSSMAN:    Now, is it a fact the

other students that you interviewed, that

is Students B, C, D, E, F, G, H and I,

either did not remember the incident or

did not see Mr. Storman touch Student A

with a piece of paper?

MR. BOYLES:    That's correct, which

is very common when you're dealing with

special education children.

MR. GROSSMAN:    I didn't ask you

that.  I didn't ask you, but, however,

there were special ed students who said to

you they did not see -- they saw an

incident, but they did not see Mr. Storman

touch the student with the paper?

MR. BOYLES:    That's correct.

MR. GROSSMAN:    Did Student H state

that Student A told him that he, that is,

Student A, was going to get Mr. Storman in

34

1

2      trouble?

3              MR. BOYLES:    That's correct.

4              MR. GROSSMAN:    Now, when you

5      interviewed Mr. Storman, did he tell you

6      that he wasn't sure if the piece of paper

7      in his hand touched Student A's lips, and

8      if he --

9              MR. BOYLES:    (Inaudible)

10             MR. GROSSMAN:    Wait let me finish my

11     question -- and if he did it, it was

12     accidental because Student A made a move

13     towards him or lunged towards him?

14             MR. BOYLES:    He said that when he

15     approached the student, the student was

16     being disrespectful to a substitute

17     teacher.  He approached the teacher -- he

18     approached the kid, he had a piece of

19     paper rolled up in his hand, and he might

20     have hit him, you know, or tapped him on

21     the face, but in a motion to tell the kid

22     to be quiet, and then he said, in

23     retrospect, he shouldn't have made

24     physical contact with the kid.

25             MR. GROSSMAN:    Well, he denies that

Angie DePompo Court Reporting Service
(718) 667-9484

35

he said, in retrospect that he made

physical contact.

Did you attached a signed statement

of your interview with Mr. Storman to your

report?

MR. BOYLES:   No.

MR. GROSSMAN:   Okay.  Now, in your

conclusion, --

MR. BOYLES:   I also reviewed Mr.

Storman's written statement that he gave

to Ms. Marcella, where he indicated that

he, again, might have touched --

MR. GROSSMAN:   He used the word, may

have.

MR. BOYLES:   May have.

MR. GROSSMAN:   I saw that statement.

Okay, now, in your conclusion, did

you state, the allegation that Mr. Storman

placed a rolled up piece of paper into the

mouth of Student A in a sexual manner is

unsubstantiated?

MR. BOYLES:   Yes.

MR. GROSSMAN:   Now, in the phrase

that you use, a rolled up piece of paper

1                                                              36

2              into the mouth of the student, aren't

3              those your words?

4                   MR. BOYLES:   No, those are the words

5              that were in the complaint.

6                   MR. GROSSMAN:   Can you show us any

7              words in the complaint that state that Mr.

8              Storman was accused of putting a rolled up

9              piece of paper, and the key phrase is,

10             into the mouth of Student A?

11                  MR. BOYLES:   Brushed it up against

12             his lips and teeth.  I'm sure if he put it

13             in -- if he touched his teeth with it, he

14             would have had to put it in his mouth.

15                  MR. GROSSMAN:   Brushed against his

16             lips, okay, that's (inaudible)

17                  MR. BOYLES:   And his teeth.  His

18             teeth are on the other side of his lips,

19             the inside of his mouth.

20                  MR. GROSSMAN:   Where do you see the

21             word, teeth, over here?

22                  MR. BOYLES:   Right, here, lips and

23             teeth (indicating).

24                  MR. GROSSMAN:   Where?  What page?

25                  MR. BOYLES:   Page 1 of the Office of

1                                                        37

2              the Special Commissioner's referral sheet.

3                   MR. GROSSMAN:   2.0 -- is this from

4         Mr. Hylan?

5                   MR. BOYLES:   No, no, the complaint.

6                   MR. GROSSMAN:   The complaint.

7                   MR. BOYLES:   You're reading the

8         final report.

9                   MR. GROSSMAN:   Okay.  It says, --

10                   MR. BOYLES:   I don't know if you

11         have a copy of the complaint.

12                   MR. GROSSMAN:   It says, brushed a

13         rolled up piece of paper against his lips

14         --

15                   MR. BOYLES:   It's right here

16         (indicating).

17                   MR. GROSSMAN:   I haven't got that.

18         I'm referring -- this is the only evidence

19         that we have over here.

20              So, is there any statement in this

21         memorandum that indicates the word, teeth?

22         It just says, brushed his lips, doesn't

23         it?

24                   MR. BOYLES:   That is correct.

25                   MR. GROSSMAN:   Okay, nothing about

Angie DePompo, Court Reporting Service
(718) 667-9484

38

teeth.

Now, when you stated, we're going

back to the -- however, that Mr. Storman

should not have made physical contact with

Student A when he was reprimanding him.

Now, did you ever --

(Whereupon, the Side A of the tape

ended.)

Now, are you aware that the

regulation of corporal -- well, first of

all, do you feel that the statement that

was made by Thomas Hylan, when he

communicated this to Ms. Josephine

Marcella, he well-substantiated.

Now, according to your belief, do you

believe that corporal punishment had taken

place at all?

MR. BOYLES:  No, that's a boiler

plate letter.  I believe that

inappropriate physical contact was made.

Corporal punishment and inappropriate

physical contact sometimes are two

different things, okay.  If, you know, if

a teacher hauls off and smacks the kid in

39

the face, I mean, that's corporal

punishment, as opposed to inappropriate

physical contact.  I didn't feel that this

rose to the level or corporal punishment.

I felt that it rose to the level of

inappropriate physical contact, and I

recommended that the case be forwarded to

Ms. Marcella for whatever disciplinary

actions she deemed appropriate.

MR. GROSSMAN:  Let me go back to Ms.

Marcella.

Ms. Marcella, --

MS. MARCELLA:  Yes.

MR. GROSSMAN:  -- when you received

document 2.0 from Thomas Hylan and then

saw the "x" mark that substantiated, did

you believe that the corporal punishment

was substantiated?

MS. MARCELLA:  Yes.

MR. GROSSMAN:  Okay, but, however,

you just heard Mr. Boyles indicating that

he did not believe it was corporal

punishment, but, however, it was just

touching.

Angie DePompo, Court Reporting Service
(718) 667-9484

40

    MR. BOYLES:    Inappropriate touching,

is what I said.

    MR. GROSSMAN:    All right.  His

opinion was inappropriate touching.  Now,

--

    MS. MARCELLA:    But based --

    MR. GROSSMAN:    -- based upon what

you just heard, do you think that this

would merit an unsatisfactory rating, and

if not, would you be willing to change

this to satisfactory?

    MS. MARCELLA:    Well, I'll tell you,

I feel that this inappropriate touching

should not have happened.  It may not rise

to the level of corporal punishment, as

Mr. Boyles has just stated, but in this

building here, and I have several

conferences on corporal punishment and

verbal abuse, this child was embarrassed.

To me, that rises to a level, and I don't

understand how you can equate two

different teachers, one that never had

inappropriate contact with a child and one

that does, and how both of them can get

41

the same satisfactory rating.  I think a
line has to be drawn somewhere, and as
principal, I would still support the
unsatisfactory rating in this case because
the child -- he could have asked the
child, you know, what the problem was, and
then we could have worked with behavior
management on a special education child or
on any child for that matter.  However, by
brushing the paper up against his lips, he
embarrassed the child and then this should
not have been done.  This is inappropriate
contact with the child.  So, I stand by
the rating.

MR. GROSSMAN:  Yes or no would have
done.

Okay, I have finished my cross-
examination --

MR. GOLDBERG:  Okay.  Thank you.

MR. GROSSMAN:  -- for the time.

MR. GOLDBERG:  Thank you, Mr.
Grossman.

Mr. Storman or Mr. Grossman, would
you like to make a statement?

1                                                                    42

2              MR. GROSSMAN:   Well, I'm going to be

3         asking questions --

4              MR. GOLDBERG:   Questions, fine.

5              MR. GROSSMAN:    -- of Mr. Storman,

6         and then I'm going to present evidence.

7              Mr. Storman, how long have you worked

8         for the Department of Education?

9              MR. STORMAN:   (Inaudible)

10             MR. GOLDBERG:   Speak louder, so we

11        can hear.

12             MR. STORMAN:   Over twenty-five

13        years.

14             MR. GROSSMAN:   How long have you

15        been a guidance counselor?

16             MR. STORMAN:   Almost sixteen years.

17             MR. GROSSMAN:   Now, on October 26th,

18        what drew your attention to Student A?

19             MR. STORMAN:   He was using foul

20        language.  He was cursing out the

21        substitute teacher in the classroom.

22             MR. GROSSMAN:   This substitute

23        teacher, was he having difficulty with the

24        class --

25             MR. STORMAN:   It was a she.

Angie DePompo, Court Reporting Service
(718) 667-9484

1                                                    43

2              MR. GROSSMAN:   Was she having

3         difficulty with the class as a result of

4         him cursing at her?

5              MR. STORMAN:   Very much so.

6              MR. GROSSMAN:   So, did you feel that

7         Student A was a danger or threat to the

8         class by him cursing at his teacher?

9              MR. STORMAN:   I believe so because

10        she was going to lose control.  She was

11        losing control.

12             MR. GROSSMAN:   Just answer yes or

13        not.

14             Was it your intention to stabilize

15        this confrontation going on between the

16        student and teacher?

17             MR. STORMAN:   Yes.

18             MR. GROSSMAN:   By the way, Ms.

19        Marcella mentioned before that you had

20        embarrassed the student.

21             Do you think the student was

22        embarrassing that substitute teacher?

23             MR. STORMAN:   Embarrassing, very

24        much so.

25             MR. GROSSMAN:   The rolled up piece

44

of paper that you had in your hand, when
did you have this rolled up piece of paper
in your hand?  Was it before you went into
that classroom or after you went into that
classroom?

        MR. STORMAN:   Before.

        MR. GROSSMAN:   Before?

        MR. STORMAN:   Before.

        MR. GROSSMAN:   Okay.  So, it's just
something that you had in your hand
without any expectation of having to --

        MR. STORMAN:   (Inaudible)

        MR. GROSSMAN:   You know, in other
words -- don't finish my question.

        So, in other words, you had the
rolled up piece of paper before any
incident ever occurred; right?

        MR. STORMAN:   Yes.

        MR. GROSSMAN:   Before you even heard
the student curse?

        MR. STORMAN:   Yes.

        MR. GROSSMAN:   So, when you heard
the student cursing at the teacher, just
explain in your own words as to what you

1                                                    45

2          had done.

3                MR. STORMAN:    I had gone over to

4          Robert -- I had gone over near where the

5          child was, and in a motion, said, zip it.

6                MR. GROSSMAN:    How far away were you

7          from the student?

8                MR. STORMAN:    When I started or when

9          I --

10               MR. GROSSMAN:    In other words, when

11         you said, zip it?

12               MR. STORMAN:    When I said, zip it,

13         at least a foot.  Approximately, a foot.

14               MR. GROSSMAN:    A foot away, okay.

15               Now, you were standing and the

16         student was sitting?

17               MR. STORMAN:    He was -- he was on

18         his knees --

19               MR. GROSSMAN:    His knee was on the

20         chair?

21               MR. STORMAN:    Correct.

22               MR. GROSSMAN:    That's how a kid sits

23         sometimes.

24               Now, did you make a motion with the

25         piece of paper when you said, zip it?

Angie DePompa Court Reporting Service
(718) 667-9484

1                                                                46

2              MR. STORMAN:   Yes.

3              MR. GROSSMAN:   Let's make believe

4         I'm that student -- oh, by the way, before

5         we do that, did the student move at all

6         before or while you said, zip it?

7              MR. STORMAN:   While I was saying,

8         zip it, with the motion, he stood up and

9         (inaudible)

10             MR. GROSSMAN:   When you say, he

11        stood up, did he just stand vertically up

12        or did he go towards you?

13             MR. STORMAN:   On an angle towards

14        me.

15             MR. GROSSMAN: On an angle towards

16        you?

17             MR. STORMAN:   Yes.

18             MR. GROSSMAN:   Okay.  So, let's make

19        believe that I'm that student, okay, only

20        I'm not going to be cursing, and then

21        you're the teacher.  Why don't you stand

22        up, okay, and at the same time -- and then

23        let's roll up this regulation of the

24        Chancellor, very fitting?

25             MR. STORMAN:   Yes.

Angie DePompo Court Reporting Service
(718) 667-9484

47

MR. GROSSMAN:  So then, therefore,
I'm at it.  Now, where was the teacher
relative to the student?

MR. STORMAN:  She was here
(indicating).  The problem is -- you know
what the problem is -- the problem is
(inaudible)

MR. GROSSMAN:  Okay.

Where was the teacher relative to --

MR. STORMAN:  That would be like
(Inaudible)

MR. GROSSMAN:  All right, so, where
that chair is approximately (indicating)?

MR. STORMAN:  Correct.

MR. GROSSMAN:  So, here I am, I'm
saying stuff to the teacher, okay, and
then you come over, and then show me
exactly what you had done?

MR. STORMAN:  I said, zip it.

MR. GROSSMAN:  So then, he turned to
you when you said, zip it?

MR. STORMAN:  Right, I said --
right, I said, zip it (inaudible)

MR. GROSSMAN:  Now, was it your

48

1

2      intent -- sit down.  Was it your intent to

3      touch that child at all?

4           MR. STORMAN:   No.

5           MR. GROSSMAN:   The thing is that you

6      just felt it was a natural reaction by

7      saying, zip it?

8           MR. STORMAN:   Correct.

9           MR. GROSSMAN:   And basically, you

10     were trying to handle this verbally as the

11     principal said you should have handled it,

12     didn't you?

13          MR. STORMAN:   Correct.

14          MR. GROSSMAN:   Now, you had no

15     knowledge as to whether or not that paper

16     touched or didn't touch the kid; is that

17     correct?  Did you have any knowledge

18     whether --

19          MR. STORMAN:   Correct.

20          MR. GROSSMAN:   So, therefore, if it

21     did happen, I mean, it's possible -- if it

22     did happen, that would have been

23     accidental?

24          MR. STORMAN:   Absolutely.

25          MR. GROSSMAN:   Now, did you explain

1                                                                49

2          this to Mr. Boyles when he was questioning

3          you?

4                    MR. STORMAN:    Yes.

5                    MR. GROSSMAN:    And do you feel that

6          what he wrote, what he paraphrased what

7          you had said was taken out of context?

8                    MR. STORMAN:    Yes, it was.

9                    MR. GROSSMAN:    What you are saying

10         right here is the absolute truth --

11                   MR. STORMAN:    Absolute truth.

12                   MR. GROSSMAN:    -- of what occurred?

13                   MR. STORMAN:    Correct.

14                   MR. GROSSMAN:    Beyond this, I'm

15         going to -- I have a document which was

16         written by Arthur Solomon (phonetic), he

17         is a UFT representative, who had

18         accompanied Mr. Storman at the interview

19         with Mr. Boyles, and I'll read to you what

20         he printed that he signed his name, UFT

21         representative.  To whom it may concern,

22         on December 16th, 2004, I accompanied Mr.

23         Glenn Storman at the OSI.  The last

24         statement, paraphrasing Mr. Storman

25         regretting touching Student A, was taken

1                                                          50

2          out of context.  He said that he may have

3          moved towards him, and if he touched him

4          with the paper in his hand, it was

5          accidental.

6                  So, this is from --

7                  VOICE:  (Inaudible) document

8                  MR. GROSSMAN:   That will be document

9          1.

10                 Now, I also had the regulation of the

11         Chancellor, which is A420.  So, even if

12         Mr. Storman had accidentally touched the

13         child, the student on the lips, it says

14         very clearly that corporal punishment

15         shall not mean the use of reasonable

16         physical force for any of the following

17         purposes, and the one that would fit Mr.

18         Storman would be to protect another pupil

19         or teacher or any other person from

20         physical injury, and Mr. Storman felt that

21         this was escalating into something that

22         could have been violent because other

23         students were seeing that this student was

24         getting away with harassing and cursing at

25         another teacher.  So, therefore, he did

Angie DePompo Court Reporting Service
(718) 667-9484

51

2    something about it.  This would follow the

3    regulation of the Chancellor.  So, this is

4    page 2 of 3 from A420.

5        VOICE:    (Inaudible)

6        MR. GROSSMAN:    Please, if I need

7    help, I'll ask for it.

8        I also have the Lewis Foy (phonetic)

9    arbitration decision, and I'll just put an

10   asterisk by the relevant paragraphs.

11       It says that the -- its says a

12   question -- this was written -- let me

13   first go by the date of this.  This was

14   done September 1st of 1999, and this is

15   based upon precedent that existed before

16   this.  The question before the arbitrator

17   of this proceeding was very

18   straightforward.  The arbitrator must

19   determine whether the board made a

20   (inaudible) contractual standard before

21   the (inaudible) due consideration, in this

22   case, before the signing upon termination.

23   For the reasons set forth below, I find

24   that the board violated the standard set

25   forth in the agreement.  On the question

52

of due consideration, the decision of

arbitrator, Rosemarie Townley (phonetic),

in the Herbert Brown case, November 6th,

1995, was instructed, Arbitrator Townley

found that the reports -- in those days,

nobody argues with the investigation --

the reports of the OAR are in the nature

of an indictment, quote, for an individual

is charged based on evidence presented by

individuals who are not cross-examined.

So, we have no opportunity to cross-

examine Student A, and according to the

arbitrator's decision, we should have that

right, and it's also contained in the 6th

Amendment of the Constitution, that a

person must confront their accuser.  As

such, Arbitrator Townley held an OAR

report is not (inaudible) positive with a

question before an arbitrator whether an

employee committed certain acts of

corporal punishment (inaudible).

Arbitrator Townley's decision was cited

(inaudible) with approval by Arbitrator

Arthur Regal (phonetic) in the Gregory

53

White case on January 5th, 1998, in which
Arbitrator Regal found that the board
should not have used a report from the OAR
as its positive (inaudible) corporal
punishment.

So, I would like to submit this as an
appellant's document.  Also, we would like
to make note that not only was that
particular student emotionally disturbed
and a special ed student, but that whole
class that he was in were in the same
boat.  In other words, Mr. Boyles was
trying to say that they don't remember
things because of that condition.  Well,
that whole class shows the potential of
what could happen to that substitute
teacher when emotionally disturbed
children see another student cursing at
another teacher and then if nothing would
have been done.

I also have various letters.  I won't
read them to you because there are more
than a few.  So, therefore, these letters
are written by various individuals who

54

know Mr. Storman, and they have

complimented him on the excellent work

that he has done regarding his

relationship with students as a guidance

counselor.

MR. GOLDBERG:    Is that it, Mr.

Grossman?

MR. GROSSMAN:    Yes.

MR. GOLDBERG:    That's it.

MR. GROSSMAN:    And the main thing is

that as indicated by Mr. Boyles, corporal

punishment was not the issue, and the

interpretation of the principal when she

received that report from Mr. Hylan was

that she thought that Mr. Storman -- it

was substantiated that he committed

corporal punishment, and that was not the

issue, and it is our contention that if

there was anything physical, it was simply

done accidental, no intent on the part of

Mr. Storman.

We have concluded.  Now, the

administration may inquire if they wish.

MR. GOLDBERG:    Any questions from

Angie DePompo Court Reporting Service
(718) 667-9484

1                                                               55

2          the administration?

3                   MS. MARCELLA:    I have a question.  I

4          actually have a comment first.

5                   MR. GROSSMAN:    I object.

6                   MR. GOLDBERG:    It has to be in a

7          form of a question through myself.  Ask me

8          a question, and I hope to get it answered

9          for you.

10                  MS. MARCELLA:    Okay.  We're talking

11         about this child as being emotionally

12         disturbed.  The child is not emotionally

13         disturbed, he's learning disabled.

14         However, if this child was so disruptive,

15         cursing and Mr. Storman thought he was

16         such a danger, why didn't Mr. Storman

17         bring this to the attention of myself or

18         my assistant principal?  We were not told

19         anything about this.

20                  MR. GROSSMAN:    Her question is

21         vague, the timing of this, when should he

22         have done this?

23                  MS. MARCELLA:    Immediately.

24                  MR. GROSSMAN:    In other words,

25         instead of confronting the child, he

1

56

2       should have run to you?

3           MS. MARCELLA:    Well, if the child

4       was acting out so terribly and cursing the

5       teacher and doing all these terrible

6       things, why wasn't it brought to the

7       administration?

8           MR. GROSSMAN:    I'll let Mr. Storman

9       answer that question.

10          MR. STORMAN:    Because when I went

11      over to him and I said to him to stop, to

12      zip it, he basically stopped because I was

13      attending to it.  It ended there,

14      basically.

15          MS. MARCELLA:    He didn't what, I'm

16      sorry?

17          MR. STORMAN:    He stopped making any

18      kind of difficult behavior and comments to

19      the substitute teacher when I went over to

20      him and to say, zip it.  So, as the

21      situation was ameliorated -- I come to you

22      often when situations are like that, why

23      wouldn't I come to you for that if it was

24      warranted?

25          MS. MARCELLA:    Well, that's my

57

question because you're saying it's such a
threatening manner, and you were fearful
for the teacher's life and for the
children's lives.  I know the child.

MR. GROSSMAN:   He answered the
question.  He handled it, period, okay.

MR. GOLDBERG:   Okay.

MS. MARCELLA:   Okay.

MR. GOLDBERG:   Any other questions,
please?

(No response.)

MR. GOLDBERG:   Ms. Marcella, any
other questions?

MS. MARCELLA:   No, thank you.

MR. GOLDBERG:   Okay.  Would the
administration like to make a final
statement or stand on the record?

MS. MARCELLA:   I'm standing on the
record.

MR. SANTAMARIA:   I'm also standing
on the record.

MR. GOLDBERG:   Mr. Grossman, the UFT
advisor, for a final statement, please.

**EXHIBIT E: TRANSCRIPT OF HEARING**                    **Page 57**

58

         MR. GROSSMAN:    Yes.  I would like to
say that this hearing should never have
occurred.

         First of all, we find that it is
incomprehensible that the principal would
wait three weeks before contacting the
Office of Special Investigations or the
OSI and so forth, waiting for a particular
student to come to school.  If anything,
somebody could have gone to their house,
and then if the parent -- and a parent is
allowed to be a complainant.  It doesn't
have to be a student.  Suppose, let's say,
the student was only five years old.  A
student cannot possibly be a complainant
at that age, but yet often parents could
be a complainant.  So, when the parent
made that phone call a few days after the
alleged incident, then that was the time
to have made a report.  It is our belief
that the principal wanted to keep this
within the school, and did not want
anything to go beyond this.  It was

59

settled, and it was only until, I guess,

when something had occurred, in other

words, that few days later, when the

parent had made that complaint and said

something sexual, this is the boiling

point.  This is where suddenly it has to

be reported to the Special Commissioner

because something sexual was being

reported.

Then, Mr. Boyles contained it when he

was asking questions, and then that boy

recanted.  It was the boy, himself, who

told the father that he was guessing that

there was something sexually involved, and

then the father simply repeated this.

There's no way the father could have

known.  He didn't see the incident.  He's

only getting what he hears from the kid.

Then the kid recants, and said, well,

it was not sexual.  Then he's saying that

the piece of paper had brushed his lips,

but meanwhile, Mr. Boyles had already

questioned a numerous number of students

**EXHIBIT E: TRANSCRIPT OF HEARING**

who either didn't remember it or they

simply -- they did remember it, but didn't

see any touching whatsoever.  And we find

that it was somewhat disingenuous on the

part of Mr. Boyles because after all,

you're not getting an exact quotation from

Mr. Storman in this report.  He is

paraphrasing.  Anyone can doctor this

anyway they want when they paraphrase it,

so then they make it look like Mr. Storman

is actually saying, gee, I might have

touched his lips, and if I did, I regret

it.  In other words, therefore, he is

trying to base a case of, let's say,

inappropriate touching, not based upon

evidence.  Here we have Student A who is

contradicting himself.  So, his testimony

is completely out.  He has no credibility.

And then as far as the other students are

concerned, which is the meat of the case,

those other students either did not

remember it or they didn't see it.  So,

therefore, the only place where Mr. Boyles

**EXHIBIT E: TRANSCRIPT OF HEARING**        **Page 60**

61

can hang his hat on to say something in
the nature of something negative against
Mr. Storman would be out of Mr. Storman's
mouth, himself.  However, we have shown
that Mr. Solomon had been there with Mr.
Storman, and he wrote exactly what Mr.
Storman had said, that he may have, and he
said that in his own statement to the
principal.  May, does not mean that he
definitely did do it.  He doesn't know,
but it was not his intent, and then if it
happened, this student had moved towards
him, and the thing is that there was no
intent on the part of Mr. Storman to
commit corporal punishment, and,
therefore, to say anything less than that,
for the principal to now say that she
would have given him a "U" rating anyway,
is disingenuous because the thing is that
she is worried about a student being
embarrassed.  Well, how about that
substitute teacher?  That substitute
teacher was embarrassed also.  Does that

**EXHIBIT E: TRANSCRIPT OF HEARING** 7-9484     **Page 61**

62

count?  Instead, we should reverse the

zoo, and, therefore, there should be no

control, and that's exactly what is

happening over here.

Mr. Storman, if he didn't do anything

and ran to the administration and couldn't

find somebody, God knows what would have

happened in that classroom.  He did what

any normal person should have done, was

simply control that child, and if

something accidentally happened by

brushing something against his lips, I

assure you if nothing sexual was involved,

this would not have reached the Special

Commissioner or the OSI, but it's only

because of that sexual business is what

brought it to their attention and this

whole thing was done.  It just would have

been that he may have done something

accidentally, brush his lips, it would

have stayed in the school.  I can't see

anything going beyond the school for

something as stupid as this, but yet here

63

1

2     we have it.

3             So, therefore, I can only say that I

4     hope that the recommendation made to the

5     Chancellor is not to ruin this man's

6     reputation and his career by having this

7     on his record of unsatisfactory, but this

8     should be overturned to satisfactory, and,

9     therefore, I hope that the final decision

10    made by the Deputy Chancellor or the new

11    Deputy Chancellor, whoever that might be,

12    would be justice, not revenge, in order to

13    rectify a situation which was blown way

14    out of proportion.  First, something

15    sexual, then you heard something about

16    teeth and into the mouth.  This is words

17    made up by Mr. Boyles.  Nothing in this

18    report said anything about a paper being

19    put into his mouth.  So, we find that this

20    was not a very objective investigation

21    that was done.  This was done to nail this

22    man, and then for Mr. Hylan to check off

23    something substantiated.  He doesn't tell

24    you what is substantiated, but, however,

25

64

the words corporal punishment are written
above it.  So then, he would have you
believe that corporal punishment was
substantiated.

　　　So, therefore, we have people being
disingenuous, being untruthful and being
false, in terms of bringing information
against an innocent person.

　　　So, therefore, I feel that this
should be completely reversed, period.

　　　MR. GOLDBERG:    I want to thank all
the parties for your participation and
cooperation.

　　　A written report will be generated to
the Chancellor, who in turn will forward a
written decision to all the participants.

　　　It is now approximately 2:25, and I
am concluding this review.

　　　Have a good day, and thank you for
your participation.

　　　VOICES:    Thank you.

　　　　　　* * * * *

65

* * * * * *

I, Dorothy Florentino, do hereby state
that the foregoing was transcribed from an
audio/video tape cassette to the best of my
ability.

_Dorothy Florentino_

Dorothy Florentino

Agency Name:    **AGENCY DEPOMPO COURT**
                **REPORTING SERVICE**
                **86 Kensico Street**
                **Staten Island, New York 10306**

Dated:    _Sept 11, 2006_

**EXHIBIT E: TRANSCRIPT OF HEARING**          **Page 65**