19

Marcella's expertise or advice?

MR. SANTAMARIA:  Ms. Marcella is one of my super -- I'll explain it.  Ms. Marcella is like a supervising principal for me, and if she was advised by her (inaudible)

MR. GROSSMAN:  Okay.  All right, I just wanted to make sure where it came from.

MR. SANTAMARIA:  Um-hm.

MR. GROSSMAN:  Okay, I have no further questions.

Now, Ms. Marcella, --

MS. MARCELLA:  Yes.

MR. GROSSMAN:  -- did you call the Office of Special Investigations, Special Commissioner of Investigations, regarding Mr. Storman, based on an accusation made by Student A's father?

MS. MARCELLA:  No, I didn't call, I put it online.

MR. GROSSMAN:  Oh, you put it online.

MS. MARCELLA:  Yes.

1                                                          20

2           MR. GROSSMAN:   But, however, did you

3      put it online on the basis of an

4      accusation that was made by the father of

5      Student A?

6           MS. MARCELLA:   Yes, I just reported

7      what was -- the information that was given

8      to me.

9           MR. GROSSMAN:   Okay.  Now, did

10     Student A's father relate to you that Mr.

11     Storman brushed a rolled up piece of paper

12     against his son's lips, and that Mr.

13     Storman was acting out a sexual fantasy?

14          MS. MARCELLA:   That's what the

15     father claimed.

16          MR. GROSSMAN:   Now, if Student A's

17     father omitted his son's theory or his

18     theory about the alleged sexual fantasy,

19     would you still have called the Office of

20     the Special Commissioner?

21          MS. MARCELLA:   I'm sorry.  Sir, I

22     missed the last few words, I'm sorry.

23          MR. GROSSMAN:   I'll repeat it.

24          Suppose -- it is hypothetical, but if

25     Student A's father omitted the part about

Regis DeBonne Court Reporting Service
(718) 667-9484

21

his son's theory or the father's theory about the alleged sexual fantasy, would you have still call the Office of the Special Commissioner of Investigations?

MS. MARCELLA:   Yes, I would have reported it because --

MR. GROSSMAN:   I didn't ask you why. I just asked you if you would or you wouldn't?

MS. MARCELLA:   Okay, I would have.

MR. GROSSMAN:   All right.  Now, did you call the Office of the Special Commissioner on the same day Student A's father called you?

MS. MARCELLA:   I could tell you that in a minute, sir, just hold on.

MR. GROSSMAN:   That's all right. I'm going by the report.

MS. MARCELLA:   Yes.  The date here is 10/26/04.  The report was made 10/26/04.

MR. GROSSMAN:   You made the report 10/26/04?

MS. MARCELLA:   That's what it says.

Angie DePepeo Court Reporting Service
(718) 667-9484

1                                                                    22

2          The control number I have in front of me,

3          it looks like 10/26/04.

4               MR. GROSSMAN:   Well, according to

5          the origin of the complaint on 2.1, it --

6               MS. MARCELLA:   One second.

7               MR. GROSSMAN:   Yes.

8               MS. MARCELLA:   I'm looking at the

9          papers in front of me because it was in

10         October.  It says that the control number

11         has been generated for this report

12         10/26/04.

13              MR. GROSSMAN:   Now, --

14              MS. MARCELLA:   One second -- 11 --

15         I'll tell you in a minute.  I have to

16         refresh my memory.  It was a while ago.

17              MR. GROSSMAN:   If you look at 2.1,

18         that could refresh your memory.

19              MR. GOLDBERG:   If you look at the

20         report in the first paragraph.

21              MS. MARCELLA:   In the report, one

22         second -- 11/16.  Yes, okay.  What

23         happened was, it happened October 26th,

24         and the father called me a few days after

25         that happened.  What happened was, the

23

1
2      child was absent from school, and when we

3      called the house to find out why the child

4      was absent, the father spoke to me and he

5      said that he had been trying to get the

6      school, and he's not sending back the

7      child because of this teacher being in the

8      school that did something to his child.

9          So, I said, well, sir, I have to

10     speak to your child.  Please send your

11     child back to school, and he said, well, I

12     don't want my child questioned until I'm

13     there with him, and the father did not

14     come until 11/16, whatever that day is,

15     and that's when I reported it when the

16     father came up.

17         MR. GROSSMAN:   Okay.  So, therefore,

18     what you're saying is that you reported

19     this incident, waiting for this child --

20         MS. MARCELLA:   I didn't know what it

21     was.

22         MR. GROSSMAN:   -- three weeks --

23         MS. MARCELLA:   The father refused to

24     tell me until he was with --

25         MR. GROSSMAN:   Ma'am, I'm going by

24

the facts.  You waited three weeks after

the alleged incident had occurred to make

a report; is that correct?

MS. MARCELLA:    Sir, I couldn't make

a report if I didn't know what the

incident was.  The man refused to tell me.

MR. GROSSMAN:    I didn't ask you

whether or not -- whether you could or

your couldn't.  I'm just establishing a

fact that you waited three weeks after the

alleged incident before you made a report

because obviously, you could have made a

report, and could not --

MS. MARCELLA:    No, I could not

because if you're familiar with the online

occurrence reports, if you don't put in

certain information, it won't take the

report.

MR. GROSSMAN:    So, if that child

never came back to school at all, then you

would never have -- then you would never

have made a report.

MS. MARCELLA:    No, I wouldn't know

what to put in.  If you go online and try

25

to put in the report, you'll know what I mean. I've been doing it for three years.

MR. GROSSMAN:  Okay. I wanted to establish that this was done three weeks later.

MS. MARCELLA:  It was done the minute I found out about what had happened.

MR. GROSSMAN:  Uh-huh.

Is it a fact that when you spoke with Mr. Storman, after the incident, that you told him you had no intention of making any such report and you only did it after the father called you; isn't that correct?

MS. MARCELLA:  Absolutely not.

MR. GROSSMAN:  Okay.

MS. MARCELLA:  I report everything that comes by me, everything.

MR. GROSSMAN:  But you reported it three weeks after the incident.

MS. MARCELLA:  I didn't know what the incident was, sir.

MR. GROSSMAN:  I have no further questions.

26

You didn't know what the incident
was?

MS. MARCELLA:   No.

MR. GROSSMAN:   Okay.

MS. MARCELLA:   I could not report
something on a teacher if I don't know
what it is.

MR. GROSSMAN:   Well, the father had
already called you, so you had some
knowledge of the incident.

MS. MARCELLA:   But I didn't know
what the incident was, sir.

MR. GROSSMAN:   Even though the
father called you?

MR. GOLDBERG:   Mr. Grossman, --

MS. MARCELLA:   He said to me, you
cannot speak to my son.

MR. GOLDBERG:   -- she answered it.
She answered it.

MR. GROSSMAN:   Fine.

MS. MARCELLA:   I answered it.

MR. GOLDBERG:   Okay, Ms. Marcella.
Yes.

MR. BOYLES:   The online system for

27

filing complaints, if certain data is not

entered, it won't allow you to go to the

next -- to continue.

MS. MARCELLA:   Thank you.

MR. GROSSMAN:   Let me question Mr.

Boyles.

Mr. Boyles, is it fair to say that

your report was written in the third

person, that is, it paraphrased the

statements made by the people who were

interviewed?

MR. BOYLES:   That is correct.

MR. GROSSMAN:   Now, did you

proofread this report before it was sent

to Mr. Hylan?

MR. BOYLES:   Yes.

MR. GROSSMAN:   Okay.   Did Mr.

Storman have the same opportunity to

proofread your report before it was sent

to Mr. Hylan?

MR. BOYLES:   No.

MR. GROSSMAN:   Were your interviews

audio or videotaped?

MR. BOYLES:   No.

28

1

2          MR. GROSSMAN:    Do you have

3   transcripts of your interviews, that is

4   questions made -- questions asked and

5   answers made?

6          MR. BOYLES:    No.

7          MR. GROSSMAN:    In your background

8   check of Mr. Storman, did you conclude

9   that there were no previous corporal

10  punishment accusations made against him?

11         MR. BOYLES:    I believe he had one

12  prior case of harassment which was

13  unsubstantiated.

14         MR. GROSSMAN:    No, I'm not asking

15  about harassment --

16         MR. BOYLES:    No, no prior cases.

17         MR. GROSSMAN:    -- or anything

18  unsubstantiated, but there were no priors

19  --

20         MR. BOYLES:    No.

21         MR. GROSSMAN:    -- as far as corporal

22  punishment.  Okay.

23         Now, when you interviewed Student A,

24  did he contradict what he originally

25  claimed regarding his theory that Mr.

29

Storman acted out of a sexual fantasy by
stating to you that he does not believe
that Mr. Storman's action was sexual in
nature?

MR. BOYLES:    Yes, but he didn't --
well, the original complaint was his
father's words.  I don't know where the
father got that from, if the son had told
him that, but when I spoke to Student A,
he told me that Mr. Storman made physical
contact with him with the piece of paper.
When I questioned him about it being
sexual in nature, he said he didn't
believe it was sexual in nature.

MR. GROSSMAN:    But prior to your
speaking with Student A, was that
accusation regarding a sexual nature made
to you?

MR. BOYLES:    It was made to me in
the written complaint.

MR. GROSSMAN:    Now, you heard the
principal state before that the principal
could not send you anything online until
she had the conversation with the student'

30

is that correct, you heard that?

    MR. BOYLES:    That is correct.

    MR. GROSSMAN:    So, therefore, wouldn't it be logical then that the student repeated the same thing that the father said if that was the basis of her sending you something online regarding the accusation?  She wouldn't go by what the father said.  She would only go by what the student said.  So, therefore, if you heard something about a sexual nature, by logic, that came from the student then.

    MR. BOYLES:    Standard procedure for reporting cases, anything -- when anything sexual is mentioned, it goes to the Office of Special Commissioner.  When it's inappropriate touching or corporal punishment or verbal abuse, the complaint goes to the Office of Special Investigations.

    In this particular case, and I've dealt with Ms. Marcella numerous times in the past and she's very, very cautious, she reported this incident both to the

31

Special Commissioner's Office and to my

office at the same time.

    MR. GROSSMAN:    I understand, but,

however, I'm not getting into the

protocol.  What I'm trying to ask you is

that you said before that this might have

been the father's theory and not the son's

theory; correct?

    MR. BOYLES:    Well, based on the

complaint that I got, which was referred

from the Office of Special Commissioner,

said that the father related these facts.

    MR. GROSSMAN:    Right.  He related

these facts, but, however, --

    MR. BOYLES:    Now, to show me that

the father got that information from his

son seeing that the father is not in the

class.

    MR. GROSSMAN:    Okay, fair enough.

So, he got this information from his son?

    MR. BOYLES:    That's correct.

    MR. GROSSMAN:    So, therefore, his

son did contradict himself when now he's

saying that he doesn't believe there was

32

anything sexual in terms of what Mr. Storman had done?

MR. BOYLES:  Right, and my conclusion indicated that we didn't believe it was sexual in nature.  I had substantiated that part of it.

MR. GROSSMAN:  Yes, I know that, but I just wanted to make sure in terms of the student's state of mind, in terms of before and after.

Now, was Student A, to your knowledge, a special education student?

MR. BOYLES:  Yes.

MR. GROSSMAN:  Did you conduct a psychological background check on Student A?

MR. GOLDBERG:  Could you repeat that again.

MR. GROSSMAN:  Okay.  Did you conduct a psychological background check on Student A?

MR. BOYLES:  No, sir.

MR. GROSSMAN:  So, there was no way for you to know whether or not Student A

33

1

2      may have been emotionally disturbed?

3          MR. BOYLES:    I believe Ms. Marcella

4      informed me that the students in the class

5      of special education, they are learning

6      disabled.

7          MR. GROSSMAN:    Now, is it a fact the

8      other students that you interviewed, that

9      is Students B, C, D, E, F, G, H and I,

10     either did not remember the incident or

11     did not see Mr. Storman touch Student A

12     with a piece of paper?

13         MR. BOYLES:    That's correct, which

14     is very common when you're dealing with

15     special education children.

16         MR. GROSSMAN:    I didn't ask you

17     that.  I didn't ask you, but, however,

18     there were special ed students who said to

19     you they did not see -- they saw an

20     incident, but they did not see Mr. Storman

21     touch the student with the paper?

22         MR. BOYLES:    That's correct.

23         MR. GROSSMAN:    Did Student H state

24     that Student A told him that he, that is,

25     Student A, was going to get Mr. Storman in

34

trouble?

MR. BOYLES:    That's correct.

MR. GROSSMAN:    Now, when you
interviewed Mr. Storman, did he tell you
that he wasn't sure if the piece of paper
in his hand touched Student A's lips, and
if he --

MR. BOYLES:    (Inaudible)

MR. GROSSMAN:    Wait let me finish my
question -- and if he did it, it was
accidental because Student A made a move
towards him or lunged towards him?

MR. BOYLES:    He said that when he
approached the student, the student was
being disrespectful to a substitute
teacher.  He approached the teacher -- he
approached the kid, he had a piece of
paper rolled up in his hand, and he might
have hit him, you know, or tapped him on
the face, but in a motion to tell the kid
to be quiet, and then he said, in
retrospect, he shouldn't have made
physical contact with the kid.

MR. GROSSMAN:    Well, he denies that

35

he said, in retrospect that he made

physical contact.

Did you attached a signed statement

of your interview with Mr. Storman to your

report?

MR. BOYLES:   No.

MR. GROSSMAN:   Okay.  Now, in your

conclusion, --

MR. BOYLES:   I also reviewed Mr.

Storman's written statement that he gave

to Ms. Marcella, where he indicated that

he, again, might have touched --

MR. GROSSMAN:   He used the word, may

have.

MR. BOYLES:   May have.

MR. GROSSMAN:   I saw that statement.

Okay, now, in your conclusion, did

you state, the allegation that Mr. Storman

placed a rolled up piece of paper into the

mouth of Student A in a sexual manner is

unsubstantiated?

MR. BOYLES:   Yes.

MR. GROSSMAN:   Now, in the phrase

that you use, a rolled up piece of paper

36

into the mouth of the student, aren't

those your words?

    MR. BOYLES:   No, those are the words

that were in the complaint.

    MR. GROSSMAN:   Can you show us any

words in the complaint that state that Mr.

Storman was accused of putting a rolled up

piece of paper, and the key phrase is,

into the mouth of Student A?

    MR. BOYLES:   Brushed it up against

his lips and teeth.  I'm sure if he put it

in -- if he touched his teeth with it, he

would have had to put it in his mouth.

    MR. GROSSMAN:   Brushed against his

lips, okay, that's (inaudible)

    MR. BOYLES:   And his teeth.  His

teeth are on the other side of his lips,

the inside of his mouth.

    MR. GROSSMAN:   Where do you see the

word, teeth, over here?

    MR. BOYLES:   Right, here, lips and

teeth (indicating).

    MR. GROSSMAN:   Where?  What page?

    MR. BOYLES:   Page 1 of the Office of

37

the Special Commissioner's referral sheet.

MR. GROSSMAN:   2.0 -- is this from Mr. Hylan?

MR. BOYLES:   No, no, the complaint.

MR. GROSSMAN:   The complaint.

MR. BOYLES:   You're reading the final report.

MR. GROSSMAN:   Okay.  It says, --

MR. BOYLES:   I don't know if you have a copy of the complaint.

MR. GROSSMAN:   It says, brushed a rolled up piece of paper against his lips --

MR. BOYLES:   It's right here (indicating).

MR. GROSSMAN:   I haven't got that. I'm referring -- this is the only evidence that we have over here.

So, is there any statement in this memorandum that indicates the word, teeth? It just says, brushed his lips, doesn't it?

MR. BOYLES:   That is correct.

MR. GROSSMAN:   Okay, nothing about

Angie DePompo Court Reporting Service
(718) 667-9484

38

teeth.

Now, when you stated, we're going

back to the -- however, that Mr. Storman

should not have made physical contact with

Student A when he was reprimanding him.

Now, did you ever --

(Whereupon, the Side A of the tape

ended.)

Now, are you aware that the

regulation of corporal -- well, first of

all, do you feel that the statement that

was made by Thomas Hylan, when he

communicated this to Ms. Josephine

Marcella, he well-substantiated.

Now, according to your belief, do you

believe that corporal punishment had taken

place at all?

MR. BOYLES:   No, that's a boiler

plate letter.  I believe that

inappropriate physical contact was made.

Corporal punishment and inappropriate

physical contact sometimes are two

different things, okay.  If, you know, if

a teacher hauls off and smacks the kid in

39

the face, I mean, that's corporal

punishment, as opposed to inappropriate

physical contact.  I didn't feel that this

rose to the level or corporal punishment.

I felt that it rose to the level of

inappropriate physical contact, and I

recommended that the case be forwarded to

Ms. Marcella for whatever disciplinary

actions she deemed appropriate.

    MR. GROSSMAN:   Let me go back to Ms.

Marcella.

    Ms. Marcella, --

    MS. MARCELLA:   Yes.

    MR. GROSSMAN:   -- when you received

document 2.0 from Thomas Hylan and then

saw the "x" mark that substantiated, did

you believe that the corporal punishment

was substantiated?

    MS. MARCELLA:   Yes.

    MR. GROSSMAN:   Okay, but, however,

you just heard Mr. Boyles indicating that

he did not believe it was corporal

punishment, but, however, it was just

touching.

Angie DePompo Court Reporting Service
(718) 667-9484

40

1

2          MR. BOYLES:    Inappropriate touching,

3     is what I said.

4          MR. GROSSMAN:    All right.  His

5     opinion was inappropriate touching.  Now,

6     --

7          MS. MARCELLA:    But based --

8          MR. GROSSMAN:    -- based upon what

9     you just heard, do you think that this

10    would merit an unsatisfactory rating, and

11    if not, would you be willing to change

12    this to satisfactory?

13         MS. MARCELLA:    Well, I'll tell you,

14    I feel that this inappropriate touching

15    should not have happened.  It may not rise

16    to the level of corporal punishment, as

17    Mr. Boyles has just stated, but in this

18    building here, and I have several

19    conferences on corporal punishment and

20    verbal abuse, this child was embarrassed.

21    To me, that rises to a level, and I don't

22    understand how you can equate two

23    different teachers, one that never had

24    inappropriate contact with a child and one

25    that does, and how both of them can get

41

the same satisfactory rating.  I think a
line has to be drawn somewhere, and as
principal, I would still support the
unsatisfactory rating in this case because
the child -- he could have asked the
child, you know, what the problem was, and
then we could have worked with behavior
management on a special education child or
on any child for that matter.  However, by
brushing the paper up against his lips, he
embarrassed the child and then this should
not have been done.  This is inappropriate
contact with the child.  So, I stand by
the rating.

MR. GROSSMAN:  Yes or no would have
done.

Okay, I have finished my cross-
examination --

MR. GOLDBERG:  Okay.  Thank you.

MR. GROSSMAN:  -- for the time.

MR. GOLDBERG:  Thank you, Mr.
Grossman.

Mr. Storman or Mr. Grossman, would
you like to make a statement?

42

MR. GROSSMAN:   Well, I'm going to be asking questions --

MR. GOLDBERG:   Questions, fine.

MR. GROSSMAN:   -- of Mr. Storman, and then I'm going to present evidence.

Mr. Storman, how long have you worked for the Department of Education?

MR. STORMAN:   (Inaudible)

MR. GOLDBERG:   Speak louder, so we can hear.

MR. STORMAN:   Over twenty-five years.

MR. GROSSMAN:   How long have you been a guidance counselor?

MR. STORMAN:   Almost sixteen years.

MR. GROSSMAN:   Now, on October 26th, what drew your attention to Student A?

MR. STORMAN:   He was using foul language.  He was cursing out the substitute teacher in the classroom.

MR. GROSSMAN:   This substitute teacher, was he having difficulty with the class --

MR. STORMAN:   It was a she.

Angie DeRonno Court Reporting Service
(718) 667-9484

43

1

2        MR. GROSSMAN:    Was she having

3     difficulty with the class as a result of

4     him cursing at her?

5        MR. STORMAN:    Very much so.

6        MR. GROSSMAN:    So, did you feel that

7     Student A was a danger or threat to the

8     class by him cursing at his teacher?

9        MR. STORMAN:    I believe so because

10    she was going to lose control.  She was

11    losing control.

12       MR. GROSSMAN:    Just answer yes or

13    not.

14       Was it your intention to stabilize

15    this confrontation going on between the

16    student and teacher?

17       MR. STORMAN:    Yes.

18       MR. GROSSMAN:    By the way, Ms.

19    Marcella mentioned before that you had

20    embarrassed the student.

21       Do you think the student was

22    embarrassing that substitute teacher?

23       MR. STORMAN:    Embarrassing, very

24    much so.

25       MR. GROSSMAN:    The rolled up piece

1                                                                    44

2          of paper that you had in your hand, when

3          did you have this rolled up piece of paper

4          in your hand?  Was it before you went into

5          that classroom or after you went into that

6          classroom?

7               MR. STORMAN:   Before.

8               MR. GROSSMAN:   Before?

9               MR. STORMAN:   Before.

10              MR. GROSSMAN:   Okay.  So, it's just

11         something that you had in your hand

12         without any expectation of having to --

13              MR. STORMAN:   (Inaudible)

14              MR. GROSSMAN:   You know, in other

15         words -- don't finish my question.

16              So, in other words, you had the

17         rolled up piece of paper before any

18         incident ever occurred; right?

19              MR. STORMAN:   Yes.

20              MR. GROSSMAN:   Before you even heard

21         the student curse?

22              MR. STORMAN:   Yes.

23              MR. GROSSMAN:   So, when you heard

24         the student cursing at the teacher, just

25         explain in your own words as to what you

45

had done.

MR. STORMAN:    I had gone over to
Robert -- I had gone over near where the
child was, and in a motion, said, zip it.

MR. GROSSMAN:    How far away were you
from the student?

MR. STORMAN:    When I started or when
I --

MR. GROSSMAN:    In other words, when
you said, zip it?

MR. STORMAN:    When I said, zip it,
at least a foot.  Approximately, a foot.

MR. GROSSMAN:    A foot away, okay.

Now, you were standing and the
student was sitting?

MR. STORMAN:    He was -- he was on
his knees --

MR. GROSSMAN:    His knee was on the
chair?

MR. STORMAN:    Correct.

MR. GROSSMAN:    That's how a kid sits
sometimes.

Now, did you make a motion with the
piece of paper when you said, zip it?

46

1

2          MR. STORMAN:   Yes.

3          MR. GROSSMAN:   Let's make believe

4   I'm that student -- oh, by the way, before

5   we do that, did the student move at all

6   before or while you said, zip it?

7          MR. STORMAN:   While I was saying,

8   zip it, with the motion, he stood up and

9   (inaudible)

10          MR. GROSSMAN:   When you say, he

11   stood up, did he just stand vertically up

12   or did he go towards you?

13          MR. STORMAN:   On an angle towards

14   me.

15          MR. GROSSMAN: On an angle towards

16   you?

17          MR. STORMAN:   Yes.

18          MR. GROSSMAN:   Okay.  So, let's make

19   believe that I'm that student, okay, only

20   I'm not going to be cursing, and then

21   you're the teacher.  Why don't you stand

22   up, okay, and at the same time -- and then

23   let's roll up this regulation of the

24   Chancellor, very fitting?

25          MR. STORMAN:   Yes.

1                                                                47

2              MR. GROSSMAN:   So then, therefore,

3        I'm at it.  Now, where was the teacher

4        relative to the student?

5              MR. STORMAN:   She was here

6        (indicating).  The problem is -- you know

7        what the problem is -- the problem is

8        (inaudible)

9              MR. GROSSMAN:   Okay.

10             Where was the teacher relative to --

11             MR. STORMAN:   That would be like

12       (Inaudible)

13             MR. GROSSMAN:   All right, so, where

14       that chair is approximately (indicating)?

15             MR. STORMAN:   Correct.

16             MR. GROSSMAN:   So, here I am, I'm

17       saying stuff to the teacher, okay, and

18       then you come over, and then show me

19       exactly what you had done?

20             MR. STORMAN:   I said, zip it.

21             MR. GROSSMAN:   So then, he turned to

22       you when you said, zip it?

23             MR. STORMAN:   Right, I said --

24       right, I said, zip it (inaudible)

25             MR. GROSSMAN:   Now, was it your

Angie DePompa Court Reporting Service
(718) 667-9484

48

intent -- sit down.  Was it your intent to

touch that child at all?

MR. STORMAN:   No.

MR. GROSSMAN:   The thing is that you

just felt it was a natural reaction by

saying, zip it?

MR. STORMAN:   Correct.

MR. GROSSMAN:   And basically, you

were trying to handle this verbally as the

principal said you should have handled it,

didn't you?

MR. STORMAN:   Correct.

MR. GROSSMAN:   Now, you had no

knowledge as to whether or not that paper

touched or didn't touch the kid; is that

correct?  Did you have any knowledge

whether --

MR. STORMAN:   Correct.

MR. GROSSMAN:   So, therefore, if it

did happen, I mean, it's possible -- if it

did happen, that would have been

accidental?

MR. STORMAN:   Absolutely.

MR. GROSSMAN:   Now, did you explain

49

1     this to Mr. Boyles when he was questioning

2     you?

3     MR. STORMAN:    Yes.

4     MR. GROSSMAN:    And do you feel that

5     what he wrote, what he paraphrased what

6     you had said was taken out of context?

7     MR. STORMAN:    Yes, it was.

8     MR. GROSSMAN:    What you are saying

9     right here is the absolute truth --

10    MR. STORMAN:    Absolute truth.

11    MR. GROSSMAN:    -- of what occurred?

12    MR. STORMAN:    Correct.

13    MR. GROSSMAN:    Beyond this, I'm

14    going to -- I have a document which was

15    written by Arthur Solomon (phonetic), he

16    is a UFT representative, who had

17    accompanied Mr. Storman at the interview

18    with Mr. Boyles, and I'll read to you what

19    he printed that he signed his name, UFT

20    representative.  To whom it may concern,

21    on December 16th, 2004, I accompanied Mr.

22    Glenn Storman at the OSI.  The last

23    statement, paraphrasing Mr. Storman

24    regretting touching Student A, was taken

Josie DePompo Court Reporting Service
(718) 667-9484

50

1
2    out of context. He said that he may have
3    moved towards him, and if he touched him
4    with the paper in his hand, it was
5    accidental.
6        So, this is from --
7        VOICE:   (Inaudible) document
8        MR. GROSSMAN:    That will be document
9    1.
10       Now, I also had the regulation of the
11   Chancellor, which is A420. So, even if
12   Mr. Storman had accidentally touched the
13   child, the student on the lips, it says
14   very clearly that corporal punishment
15   shall not mean the use of reasonable
16   physical force for any of the following
17   purposes, and the one that would fit Mr.
18   Storman would be to protect another pupil
19   or teacher or any other person from
20   physical injury, and Mr. Storman felt that
21   this was escalating into something that
22   could have been violent because other
23   students were seeing that this student was
24   getting away with harassing and cursing at
25   another teacher. So, therefore, he did

51

2    something about it.  This would follow the

3    regulation of the Chancellor.  So, this is

4    page 2 of 3 from A420.

5        VOICE:   (Inaudible)

6        MR. GROSSMAN:   Please, if I need

7    help, I'll ask for it.

8        I also have the Lewis Foy (phonetic)

9    arbitration decision, and I'll just put an

10    asterisk by the relevant paragraphs.

11        It says that the -- its says a

12    question -- this was written -- let me

13    first go by the date of this.  This was

14    done September 1st of 1999, and this is

15    based upon precedent that existed before

16    this.  The question before the arbitrator

17    of this proceeding was very

18    straightforward.  The arbitrator must

19    determine whether the board made a

20    (inaudible) contractual standard before

21    the (inaudible) due consideration, in this

22    case, before the signing upon termination.

23    For the reasons set forth below, I find

24    that the board violated the standard set

25    forth in the agreement.  On the question

Angie DePompo Court Reporting Service
(718) 637-9484

52

1
2      of due consideration, the decision of

3      arbitrator, Rosemarie Townley (phonetic),

4      in the Herbert Brown case, November 6th,

5      1995, was instructed, Arbitrator Townley

6      found that the reports -- in those days,

7      nobody argues with the investigation --

8      the reports of the OAR are in the nature

9      of an indictment, quote, for an individual

10     is charged based on evidence presented by

11     individuals who are not cross-examined.

12         So, we have no opportunity to cross-

13     examine Student A, and according to the

14     arbitrator's decision, we should have that

15     right, and it's also contained in the 6th

16     Amendment of the Constitution, that a

17     person must confront their accuser.  As

18     such, Arbitrator Townley held an OAR

19     report is not (inaudible) positive with a

20     question before an arbitrator whether an

21     employee committed certain acts of

22     corporal punishment (inaudible).

23     Arbitrator Townley's decision was cited

24     (inaudible) with approval by Arbitrator

25     Arthur Regal (phonetic) in the Gregory

53

1

2   White case on January 5th, 1998, in which

3   Arbitrator Regal found that the board

4   should not have used a report from the OAR

5   as its positive (inaudible) corporal

6   punishment.

7        So, I would like to submit this as an

8   appellant's document.  Also, we would like

9   to make note that not only was that

10  particular student emotionally disturbed

11  and a special ed student, but that whole

12  class that he was in were in the same

13  boat.  In other words, Mr. Boyles was

14  trying to say that they don't remember

15  things because of that condition.  Well,

16  that whole class shows the potential of

17  what could happen to that substitute

18  teacher when emotionally disturbed

19  children see another student cursing at

20  another teacher and then if nothing would

21  have been done.

22        I also have various letters.  I won't

23  read them to you because there are more

24  than a few.  So, therefore, these letters

25  are written by various individuals who

54

know Mr. Storman, and they have

complimented him on the excellent work

that he has done regarding his

relationship with students as a guidance

counselor.

MR. GOLDBERG:    Is that it, Mr.

Grossman?

MR. GROSSMAN:    Yes.

MR. GOLDBERG:    That's it.

MR. GROSSMAN:    And the main thing is

that as indicated by Mr. Boyles, corporal

punishment was not the issue, and the

interpretation of the principal when she

received that report from Mr. Hylan was

that she thought that Mr. Storman -- it

was substantiated that he committed

corporal punishment, and that was not the

issue, and it is our contention that if

there was anything physical, it was simply

done accidental, no intent on the part of

Mr. Storman.

We have concluded.  Now, the

administration may inquire if they wish.

MR. GOLDBERG:    Any questions from

55

the administration?

MS. MARCELLA:  I have a question.  I actually have a comment first.

MR. GROSSMAN:  I object.

MR. GOLDBERG:  It has to be in a form of a question through myself.  Ask me a question, and I hope to get it answered for you.

MS. MARCELLA:  Okay.  We're talking about this child as being emotionally disturbed.  The child is not emotionally disturbed, he's learning disabled.  However, if this child was so disruptive, cursing and Mr. Storman thought he was such a danger, why didn't Mr. Storman bring this to the attention of myself or my assistant principal?  We were not told anything about this.

MR. GROSSMAN:  Her question is vague, the timing of this, when should he have done this?

MS. MARCELLA:  Immediately.

MR. GROSSMAN:  In other words, instead of confronting the child, he

56

should have run to you?

MS. MARCELLA:   Well, if the child was acting out so terribly and cursing the teacher and doing all these terrible things, why wasn't it brought to the administration?

MR. GROSSMAN:   I'll let Mr. Storman answer that question.

MR. STORMAN:   Because when I went over to him and I said to him to stop, to zip it, he basically stopped because I was attending to it.  It ended there, basically.

MS. MARCELLA:   He didn't what, I'm sorry?

MR. STORMAN:   He stopped making any kind of difficult behavior and comments to the substitute teacher when I went over to him and to say, zip it.  So, as the situation was ameliorated -- I come to you often when situations are like that, why wouldn't I come to you for that if it was warranted?

MS. MARCELLA:   Well, that's my

57

question because you're saying it's such a
threatening manner, and you were fearful
for the teacher's life and for the
children's lives.  I know the child.

MR. GROSSMAN:  He answered the
question.  He handled it, period, okay.

MR. GOLDBERG:  Okay.

MS. MARCELLA:  Okay.

MR. GOLDBERG:  Any other questions,
please?

(No response.)

MR. GOLDBERG:  Ms. Marcella, any
other questions?

MS. MARCELLA:  No, thank you.

MR. GOLDBERG:  Okay.  Would the
administration like to make a final
statement or stand on the record?

MS. MARCELLA:  I'm standing on the
record.

MR. SANTAMARIA:  I'm also standing
on the record.

MR. GOLDBERG:  Mr. Grossman, the UFT
advisor, for a final statement, please.

**EXHIBIT E: TRANSCRIPT OF HEARING**57-9484        **Page 57**

58

```
 1
 2              MR. GROSSMAN:   Yes.  I would like to
 3         say that this hearing should never have
 4         occurred.
 5              First of all, we find that it is
 6         incomprehensible that the principal would
 7         wait three weeks before contacting the
 8         Office of Special Investigations or the
 9         OSI and so forth, waiting for a particular
10         student to come to school.  If anything,
11         somebody could have gone to their house,
12         and then if the parent -- and a parent is
13         allowed to be a complainant.  It doesn't
14         have to be a student.  Suppose, let's say,
15         the student was only five years old.  A
16         student cannot possibly be a complainant
17         at that age, but yet often parents could
18         be a complainant.  So, when the parent
19         made that phone call a few days after the
20         alleged incident, then that was the time
21         to have made a report.  It is our belief
22         that the principal wanted to keep this
23         within the school, and did not want
24         anything to go beyond this.  It was
25
```

1                                                                    59

2           settled, and it was only until, I guess,

3           when something had occurred, in other

4           words, that few days later, when the

5           parent had made that complaint and said

6           something sexual, this is the boiling

7           point.  This is where suddenly it has to

8           be reported to the Special Commissioner

9           because something sexual was being

10          reported.

11              Then, Mr. Boyles contained it when he

12          was asking questions, and then that boy

13          recanted.  It was the boy, himself, who

14          told the father that he was guessing that

15          there was something sexually involved, and

16          then the father simply repeated this.

17          There's no way the father could have

18          known.  He didn't see the incident.  He's

19          only getting what he hears from the kid.

20              Then the kid recants, and said, well,

21          it was not sexual.  Then he's saying that

22          the piece of paper had brushed his lips,

23          but meanwhile, Mr. Boyles had already

24          questioned a numerous number of students

25

**EXHIBIT E: TRANSCRIPT OF HEARING**

60

who either didn't remember it or they

simply -- they did remember it, but didn't

see any touching whatsoever.  And we find

that it was somewhat disingenuous on the

part of Mr. Boyles because after all,

you're not getting an exact quotation from

Mr. Storman in this report.  He is

paraphrasing.  Anyone can doctor this

anyway they want when they paraphrase it,

so then they make it look like Mr. Storman

is actually saying, gee, I might have

touched his lips, and if I did, I regret

it.  In other words, therefore, he is

trying to base a case of, let's say,

inappropriate touching, not based upon

evidence.  Here we have Student A who is

contradicting himself.  So, his testimony

is completely out.  He has no credibility.

And then as far as the other students are

concerned, which is the meat of the case,

those other students either did not

remember it or they didn't see it.  So,

therefore, the only place where Mr. Boyles

61

can hang his hat on to say something in

the nature of something negative against

Mr. Storman would be out of Mr. Storman's

mouth, himself.  However, we have shown

that Mr. Solomon had been there with Mr.

Storman, and he wrote exactly what Mr.

Storman had said, that he may have, and he

said that in his own statement to the

principal.  May, does not mean that he

definitely did do it.  He doesn't know,

but it was not his intent, and then if it

happened, this student had moved towards

him, and the thing is that there was no

intent on the part of Mr. Storman to

commit corporal punishment, and,

therefore, to say anything less than that,

for the principal to now say that she

would have given him a "U" rating anyway,

is disingenuous because the thing is that

she is worried about a student being

embarrassed.  Well, how about that

substitute teacher?  That substitute

teacher was embarrassed also.  Does that

**EXHIBIT E: TRANSCRIPT OF HEARING**7-9484    **Page 61**

62

count?  Instead, we should reverse the

zoo, and, therefore, there should be no

control, and that's exactly what is

happening over here.

Mr. Storman, if he didn't do anything

and ran to the administration and couldn't

find somebody, God knows what would have

happened in that classroom.  He did what

any normal person should have done, was

simply control that child, and if

something accidentally happened by

brushing something against his lips, I

assure you if nothing sexual was involved,

this would not have reached the Special

Commissioner or the OSI, but it's only

because of that sexual business is what

brought it to their attention and this

whole thing was done.  It just would have

been that he may have done something

accidentally, brush his lips, it would

have stayed in the school.  I can't see

anything going beyond the school for

something as stupid as this, but yet here

63

we have it.

So, therefore, I can only say that I hope that the recommendation made to the Chancellor is not to ruin this man's reputation and his career by having this on his record of unsatisfactory, but this should be overturned to satisfactory, and, therefore, I hope that the final decision made by the Deputy Chancellor or the new Deputy Chancellor, whoever that might be, would be justice, not revenge, in order to rectify a situation which was blown way out of proportion. First, something sexual, then you heard something about teeth and into the mouth. This is words made up by Mr. Boyles. Nothing in this report said anything about a paper being put into his mouth. So, we find that this was not a very objective investigation that was done. This was done to nail this man, and then for Mr. Hylan to check off something substantiated. He doesn't tell you what is substantiated, but, however,

64

the words corporal punishment are written

above it.  So then, he would have you

believe that corporal punishment was

substantiated.

        So, therefore, we have people being

disingenuous, being untruthful and being

false, in terms of bringing information

against an innocent person.

        So, therefore, I feel that this

should be completely reversed, period.

        MR. GOLDBERG:    I want to thank all

the parties for your participation and

cooperation.

        A written report will be generated to

the Chancellor, who in turn will forward a

written decision to all the participants.

        It is now approximately 2:25, and I

am concluding this review.

        Have a good day, and thank you for

your participation.

        VOICES:    Thank you.

                *  *  *  *  *

65

* * * * * *

I, Dorothy Florentino, do hereby state

that the foregoing was transcribed from an

audio/video tape cassette to the best of my

ability.

*Dorothy Florentino*

Dorothy Florentino

Agency Name:        **AGENCY DEPOMPO COURT**
**REPORTING SERVICE**
**86 Kensico Street**
**Staten Island, New York 10306**

Dated:        *Sept 11, 2006*

## CERTIFICATION OF SERVICE

I, Daniel Chiu, hereby certify that:

On October 12, 2007, I served the annexed Reply Declaration in Further Support of Defendant's Motion to Dismiss by depositing a true and correct copy, into the custody of United States Postal Service, in an enclosed envelope with sufficient postage for first-class mail addressed to:

> John C. Klotz, Esq.
> Attorney for Plaintiff
> 350 Fifth Avenue, Suite 4810
> New York, New York 10118

I certify under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      October 12, 2007

 

_____
                Daniel Chiu